# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| A&R LOGISTICS HOLDINGS, INC. and A&R LOGISTICS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DAVID CURL, <br><br> Defendant. | No. 15 C 7106 <br><br> Judge Thomas M. Durkin |

## MEMORANDUM OPINION AND ORDER

Plaintiffs A&R Logistics Holdings, Inc. ("ARLH") and A&R Logistics, Inc. ("A&R"), allege that A&R's former employee, David Curl, violated the non-compete clause of a stock option agreement when he took a job with a competitor and solicited A&R employees and clients. *See* R. 1-1. A&R filed this case in Cook County Circuit Court, and Curl removed it here. *See* R. 1. Curl has moved to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), or in the alternative for transfer to the Central District of California pursuant to 28 U.S.C. § 1404(a). R. 5.[1] For the following reasons, Curl's motion is denied in part and granted in part.

---

[1] Curl withdrew the parts of his motion seeking dismissal for improper venue pursuant to Rule 12(b)(3), and transfer pursuant to 28 U.S.C. § 1406(a). *See* R. 12 at 1 n.1.

## Legal Standard

"The plaintiff bears the burden of establishing personal jurisdiction when the defendant challenges it." *See N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014). On a motion challenging personal jurisdiction, the Court may "receive and weigh" affidavits and other evidence outside the pleadings. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). If the Court does not hold an evidentiary hearing to resolve factual disputes, the plaintiff "need only make out a *prima facie* case of personal jurisdiction." *See N. Grain*, 743 F.3d at 491. On a motion pursuant to Rule 12(b)(2), the Court will "resolve factual disputes in the plaintiff's favor." *Id.* The Court, however, also "accept[s] as true any facts contained in the defendant's affidavits that remain unrefuted by the plainff." *See GCIU-Employer Retirement Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009).

## Background

"A&R provides transportation, warehousing, packaging, distribution and logistics services to customers in the bulk plastic industry." R. 1-1 at 7 (¶ 9). A&R is an Illinois corporation, and is a wholly owned subsidiary of ARLH. *Id.* ¶¶ at 6 (1-2). A&R was acquired by ARLH in 2012, and in 2013 A&R's corporate headquarters moved from Morris, Illinois to Louisville, Kentucky. R. 11-2 ¶ 5. A&R's operations headquarters remains in Morris. *Id.* A&R has nine facilities in California, all of which are located in the Central District of California. *See* R. 11-1 at 4.

As part of the acquisition process, ARLH asked for a list of "the most critical managers of A&R." R. 11-2 ¶ 3. This information was important to ARLH because A&R "upper level employees" are given access to proprietary customer information, and A&R's business would be injured if this information was obtained by A&R's competitors. R. 1-1 at 7 (¶¶ 12-13). ALRH believed that it was "vitally important" to secure from "the most critical managers" agreements that they would not (1) compete with A&R; (2) solicit A&R's employees and customers; and (3) not reveal A&R's confidential information and trade secrets. R. 11-2 ¶ 7; R. 1-1 at 8 (¶ 16). In exchange for these promises, the employees were given A&R stock options. R. 1-1 at 8 (¶ 17); R. 11-2 ¶ 8.

Curl was one of the employees offered this deal. R. 1-1 at 8 (¶ 18). Curl started working for A&R in 1984. For the first 12 years of his employment he worked at A&R's Morris location. Then, "more than twenty years [ago]," Curl moved to California to work as a regional manager overseeing A&R's west coast operations. R. 6-3 ¶¶ 1-2; R. 11-1 ¶ 4. A&R alleges that "[a]s a regional manager Curl regularly and frequently travelled to Morris, Illinois to receive continuing training." R. 1-1 at 9 (¶ 21). Curl states that he "traveled very occasionally to Illinois, but typically only once or twice a year, and sometimes not at all." R. 6-3 ¶ 2. Curl also states that his "work centered in California," and that he "had very little contact with or in Illinois," consisting "primarily of conference calls involving an A&R location in Illinois and other states." *Id.* A&R's vice president of transport operations, Rick Weber, states that "Curl was required to call into Morris" daily regarding

"operations issues," weekly for meetings with Weber, and weekly for meetings with A&R's chief operating officer. R. 11-1 ¶ 5. Weber confirms that within the last two years Curl traveled to Morris four times: May 2013, July 2013, September 2013, and July 2014. *Id.* ¶ 6.

On December 18, 2012, Curl signed a stock option agreement that included "a number of restrictive covenants." R. 1-1 at 9 (¶ 23). Curl agreed that he would not accept employment with any of A&R's competitors for 12 months after leaving A&R. *See* R. 1-1 at 21 (¶ 6(e)); *id.* at 9 (¶ 24). Curl also agreed not to disclose A&R's confidential information during and after his employment. *See id.* at 19 (¶ 6(b)); *id.* at 9 (¶ 25). Curl further agreed that he would not solicit A&R employees or customers for 24 months after leaving A&R. *See id.* at 21 (¶ 6(f)); *id.* at 9-10 (¶¶ 26-27). The agreement provides that the restrictive covenants are governed by Illinois law, *see id.* at 24 (¶ 13), but it does not include a forum selection clause. Curl states that he signed the agreement when he "was physically in California," R. 6-3 ¶ 3, and that he never exercised any of the stock options. R. 12-3 ¶ 7.

Curl submitted his resignation to A&R with 30 days' notice on June 3, 2015. R. 1-1 at 10 (¶ 29); R. 12-3 ¶ 8. Curl states that after he requested pay for unused vacation, A&R terminated his employment on June 22, 2015. R. 12-3 ¶¶ 9-10. A&R alleges that Curl started working for one of its competitors, Plastic Express, shortly thereafter. R. 1-1 at 10 (¶ 30). A&R also alleges that "Curl has already attempted to induce at least seven A&R employees" to leave A&R. *Id.* at 11 (¶ 35). Weber states

4

that "Curl solicited business from . . . one of A&R's largest and longest standing customers." R. 11-1 at 5 (¶ 13).

Curl argues that the Court lacks personal jurisdiction over him because he lives and works in California, signed the agreement at issue in California, and lacks sufficient contacts with Illinois. He argues in the alternative that the case should be transferred to the Central District of California because litigating the case in Chicago would be a burden on him, most non-party witnesses are in California, and his actions giving rise to Plaintiffs' claims occurred in California.

## Analysis

### I. Personal Jurisdiction

"A federal court sitting in diversity," as is the case here, "must rely on the law of personal jurisdiction that governs the courts of general jurisdiction in the state where the court is sitting." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). Illinois law permits its courts to exercise jurisdiction over a person to the extent permitted by the Constitution. *See N. Grain*, 743 F.3d at 491 (citing 735 ILCS 5/2-209(c)). The Supreme Court has held that under the Due Process Clause of the Fourteenth Amendment a "forum state's court[s] . . . [may not] exercise personal jurisdiction over a nonconsenting, out-of-state defendant unless the defendant has 'certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. State of Washington, Office of Unemployment Comp. & Placement*, 326 U.S. 310, 319 (1945)). "If the defendant has 'continuous and systematic' contacts

5

with a state, the defendant is subject to general jurisdiction there in any action, even if the action is unrelated to those contacts." *N. Grain*, 743 F.3d at 492 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). "To support an exercise of specific personal jurisdiction, the defendant's contacts with the forum state must directly relate to the challenged conduct or transaction." *N. Grain*, 743 F.3d at 492. "Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice." *N. Grain*, 743 F.3d at 492. In general, "[t]he defendant's conduct and connection with the forum state must be substantial enough to make it reasonable for the defendant to anticipate that he could be haled into court there." *Id.* (citing *Burger King*, 471 U.S. at 474).

Plaintiffs do not argue that general jurisdiction exists here. Rather, Plaintiffs argue that specific jurisdiction exists arising out of the stock options contract. To support this argument, Plaintiffs primarily rely on the Supreme Court's opinion in the *Burger King* case. In *Burger King*, the Court held that due process permitted Burger King to sue in a Florida court one of its Michigan franchisees. The Court held that although "an individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts in the other party's

6

home forum," 471 U.S. at 478, a "dispute [that] grew directly out of a contract which had a *substantial* connection with [the forum] State" can be litigated in that state despite the defendant's residence in another state. *Id.* at 479 (emphasis in original). In *Burger King*, the franchisee "reached out beyond [his state of residence] and negotiated with a . . . corporation [in the forum state] for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." *Id.* at 479-80. The Court explained that personal jurisdiction must be applied according to "a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479 (internal citations and quotation marks omitted).

In applying the Supreme Court's holding in *Burger King*, the Seventh Circuit has held that it is "only the dealings between the parties in regard to the disputed contract that are relevant to minimum contacts analysis." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997). It is not the circumstances of the contract's breach, but the "future consequences [contemplated] by the contract itself" that are relevant to the proper application of personal jurisdiction. *See St. George Investments LLC v. QuamTel, Inc.*, 2014 WL 812157, at *5 (N.D. Ill. Mar. 3,

7

2014) (citing *Burger King*, 471 U.S. at 479). For example, in *Citadel Group Ltd. v. Washington Regional Medical Center*, the Seventh Circuit reversed the district court's decision that it lacked personal jurisdiction over an Arkansas defendant. 536 F.3d 757, 764 (7th Cir. 2008). The Arkansas defendant had breached a contract for development of land in Arkansas with an Illinois developer. *Id.* at 760. The court noted that the "end result [of the contract] would have been construction of a building in Arkansas," *id.* at 764, and that the Arkansas defendant's actual contacts with Illinois "primarily consist[ed] of correspondence by mail, fax, phone, and email." *Id.* at 762. Nevertheless, the Arkansas defendant was subject to personal jurisdiction in Illinois because the defendant had authorized the plaintiff to engage in "project development, which consisted entirely of administrative services carried out (for the most part) in Illinois." *Id.* at 764; *see also C.H. Johnson Consulting, Inc. v. Roosevelt Roads Naval Station Lands and Facilities Redevelopment Auth.*, 2013 WL 5926062, at *5 (N.D. Ill. Nov. 5, 2013) ("The numerous visits, phone calls, emails, and other correspondence between the parties constitute 'sustained and intensive contact' over the course of two to three years with the specific aim of negotiating the terms of a contract," made defendants subject to personal jurisdiction in Illinois even though "the end result [of the contract] was the development of property in Puerto Rico.").

Here, the stock options agreement between Plaintiffs and Curl arose as an aspect of Curl's employment with A&R. That employment caused him to communicate with A&R's operations headquarters in Illinois on a daily basis, and to

8

travel to Illinois at least twice a year. Although Curl's job responsibilities were focused on managing A&R's west coast operations, Curl was well aware that he undertook these responsibilities at the behest of a corporation headquartered in Illinois. Even though Curl signed the stock options agreement in California and A&R initiated the stock options offer, the agreement cannot be separated from Curl's employment, which to a large degree was associated with Illinois. Curl knew that his continued employment and agreement to the non-compete and non-disclosure clauses in the stock options agreement would have substantial effect in Illinois because A&R's operations headquarters is located there. Under these circumstances Curl should have known that he might be subject to litigation in Illinois arising out of his agreement with his Illinois employer. Further, "traditional notions of fair play and substantial justice" are not offended by requiring an employee who, like Curl, had frequent and substantial contact with his out-of-state employer to be subject to the jurisdiction of courts in his employer's home state. Thus, the Court has personal jurisdiction over Curl in this case.

## II.   Venue

Curl seeks to have this case transferred to the Central District of California pursuant to 28 U.S.C. § 1404(a). Under section 1404(a), "a district court may transfer any civil action to any other district or division where it might have been brought" for "the convenience of the parties and witnesses" and "in the interest of justice." The statute "is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case

9

consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). "The statute permits a 'flexible and individualized analysis' and affords district courts the opportunity to look beyond a narrow or rigid set of considerations in their determinations." *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) (quoting *Stewart*, 487 U.S. at 29).

"With respect to the convenience evaluation, courts generally consider the availability of and access to witnesses, and each party's access to and distance from resources in each forum." *Research Automation*, 626 F.3d at 978. "Other related factors include the location of material events and the relative ease of access to sources of proof." *Id.*

"The 'interests of justice' is a separate element of the transfer analysis that relates to the efficient administration of the court system." *Id.* "For this element, courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy." *Id.* (internal citations omitted). "The interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result." *Id.*

Courts ordinarily give substantial weight to the plaintiff's choice of a forum, especially when it is the plaintiff's home forum. *See In re Nat'l Presto Indus., Inc.*,

347 F.3d 662, 664 (7th Cir. 2003). The plaintiff's choice of forum, however, "has minimal value where none of the conduct complained of occurred in the forum selected by the plaintiff." *Chi., Rock Island & Pac. R.R. Co. v. Igoe*, 220 F.2d 299, 304 (7th Cir. 1955); *see also Roberts & Schaefer Co. v. Clyde Bergemann Delta Ducon, Inc.*, 2015 WL 1911108, at *5 (N.D. Ill. Apr. 27, 2015) ("The plaintiff's choice of forum typically is accorded significant weight, unless none of the relevant conduce occurred in that forum.") (internal citations omitted). Courts in this District have also held that "the plaintiff's choice of forum should be given less weight when that forum lacks a significant connection to the underlying claims." *Fed. Trade Comm. v. Acquinity Interactive, LLC*, 2014 WL 37808, at *2 (N.D. Ill. Jan. 6, 2014); *Opius Techs., Ltd. v. Sears Holding Corp.*, 2012 WL 2280696, at *6 (N.D. Ill. June 15, 2012).

Here, while Curl's employment with A&R certainly had a connection with Illinois, the "conduct complained of"—Curl's alleged breach of the non-compete and non-disclosure agreements—occurred in California. *See Roberts & Schaefer*, 2015 WL 1811108, at *6 (granting transfer motion where breach of contract occurred in transferee district). Since Curl's alleged bad acts occurred in California and have a tenuous relationship to Illinois, the Court gives Plaintiffs' choice of forum less weight.

Additionally, litigating this case in Chicago is more inconvenient for Curl than litigating in the Central District of California would be for Plaintiffs. Curl is an individual who would personally bear the costs of travel. *See Fed. Trade Comm.*,

11

2014 WL 37808, at *3 ("In evaluating the convenience of the parties, the Court considers the parties' residences and their ability to bear the costs of litigating in a particular forum."). Curl traveled to Illinois at least semi-annually when he was employed by A&R, but presumably A&R footed the bill. By contrast, Plaintiffs are corporations with offices in the Central District of California. To the extent that Plaintiffs' employees would be witnesses in this case, their travel costs would likely be paid by Plaintiffs. *See id.* at *3 ("In assessing this factor, courts give less weight to the burden that appearing at trial may impose on witnesses who are current employees of parties, because such witnesses typically can be expected to appear at trial voluntarily."). Two courts in this District that have addressed motions for transfer filed by out-of-state employees sued by their employers have found that the inconvenience to the employee counseled in favor of transfer. *See Info. Tech. Int'l, Inc. v. ITI of N. Fla., Inc.*, 2001 WL 1516750, at *9 (N.D. Ill. Nov. 28, 2001); *College Craft Cos., Ltd. v. Perry*, 889 F. Supp. 1052, 1056 (N.D. Ill. 1995). Thus, the convenience of the parties weighs in favor of transfer.

Furthermore, the majority of the non-party witnesses are located in California. Plaintiffs allege that Curl is disclosing their confidential information to his new employer in California, and that he is soliciting Plaintiffs' clients and employees in California. It is Curl's burden to "clearly specify the key witnesses to be called and make at least a generalized statement of what their testimony would have included." *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1293 (7th Cir. 1989). Curl did not submit a list of potential non-party witnesses until he

12

filed his reply brief. *See* R. 12-3 at 4-5 (listing 17 non-party witnesses). But a "common sense" reading of the allegations in this case makes such a list less important here. *See Info. Tech. Int'l*, 2001 WL 1516750, at *9 ("Defendants do not provided a list of names . . . . [but they] proffer a common sense argument for potential Florida witnesses . . . ."). Clearly, since the injury Plaintiffs allege consists of Curl taking a job with a competitor, disclosing confidential information, and soliciting clients and employees, testimony from those individuals will be relevant to this case. By contrast, of the ten Illinois-based witnesses identified by Plaintiffs, eight are current employees of Plaintiffs. *See* R. 11-1 at 6-7. "For trial purposes, live testimony is preferred over testimony presented by way of deposition, and thus the existence of significant third party witnesses outside the particular forum's subpoena power can be a significant factor in the section 1404(a) analysis." *Fed. Trade Comm.*, 2014 WL 37808, at *3. This is the case here, so the convenience of non-party witnesses also weighs in favor of transfer.

Lastly, the "interests of justice" analysis does not tip the scales in either direction. On the one hand, Curl has presented evidence that cases move faster in the Central District of California. On the other, the agreement at issue is governed by Illinois law, with which this Court has greater familiarity. Furthermore, neither locale has a greater relationship to this private dispute that touches both forums.

In sum, the relative convenience of the parties and non-party witnesses counsels in favor of transfer.

## Conclusion

For the foregoing reasons, Curl's motion, R. 5, is denied to the extent that the Court will not dismiss the case for lack of personal jurisdiction, and is granted to the extent that the Court transfers this case to the Central District of California.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: September 21, 2015